UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,       : 21-cr-00042-WFK-1
                                :
                                :
    - versus -                  : U.S. Courthouse
                                : Brooklyn, New York
                                :
DARREN CHARLES STEWART,         : January 28, 2021
               Defendant        :  3:45 PM
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR PROCEEDING
BEFORE THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**
(TELEPHONICALLY)


**For the Government**:        **Seth DuCharme, Esq.**
                              **Acting U.S. Attorney**


                        BY: **Tara McGrath, Esq.**
                            Assistant U.S. Attorney
                            271 Cadman Plaza East
                            Brooklyn, New York 11201


**For the Defendant**:         **Vinoo Varghese, Esq.**
                              **Gregory Marshall, Esq.**
                              Varghese & Associates, P.C.
                              2 Wall Street
                              New York, NY 10005


**Transcription Service**:     **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  Criminal Cause for Arraignment,
2   case number 21-cr-42, United States v. Darren Stewart.
3          Counsel starting with the government, please
4   state your appearances.
5          MS. MCGRATH:  Good afternoon, your Honor.
6          Tara McGrath for the government.
7          THE COURT:  Good afternoon.
8          MR. VARGHESE:  Varghese & Associates by Vinoo
9   Varghese and Gregory Marshall, 2 Wall Street, for Mr.
10  Stewart.
11         Good afternoon, your Honor.
12         THE COURT:  Good afternoon.
13         Mr. Stewart, I take it that you understand
14  English.
15         THE DEFENDANT:  Yes, I do, your Honor.
16         THE COURT:  Okay.  The (audio interference)
17  anything that's said during these proceedings that you do
18  not understand, please tell me, all right?
19         THE DEFENDANT:  Yes, your Honor.
20         THE COURT:  Okay.  The first issue I want to
21  deal with this afternoon is your consent to proceed by
22  way of a video conference.  Normally, we'd be in the
23  courthouse, you'd be there with your attorneys, the
24  government's attorney would be there, I would be there
25  and we would proceed in person but because of the COVID-

3

Proceedings

1  19 pandemic, virtually all of the proceedings in person

2  in the courthouse have stopped.

3         Now Congress has authorized us to proceed by

4  way of a video conference for this proceeding if you

5  agree to do that.

6         Mr. Varghese, have you discussed this with your

7  client?

8         MR. VARGHESE:  Yes, we did last night, your

9  Honor.

10         THE COURT:  All right.  Does he consent to

11  proceed by way of video conference?

12         MR. VARGHESE:  Yes, he does.

13         THE COURT:  Okay.  Is that correct, Mr.

14  Stewart?  Do you agree to proceed this afternoon by way

15  of video conference?

16         MR. VARGHESE:  Yes, your Honor.

17         THE COURT:  Okay.  Now you're here today

18  because the grand jury has returned an indictment

19  charging you with seven counts.  The first six counts

20  charge you with distribution of child pornography.

21  Essentially, you've been charged with knowingly and

22  intentionally distributing visual depictions using a

23  means of interstate and foreign commerce in which minors

24  engaged in sexually explicit conduct were depicted, all

25  in violation of United States law and the last count,

4

Proceedings

1  Count 7, charge you with possession of child pornography.

2          First of all, have you reviewed the charges in

3  the indictment with your attorney?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Okay.  Mr. Varghese, have you

6  reviewed the indictment with your client and advised him

7  of his rights?

8          MR. VARGHESE:  Yes.  Mr. Marshall, who is fully

9  employed here at Varghese & Associates, read through the

10 indictment with him.  We will be filing a notice of

11 appearance for Mr. Marshall shortly, we just haven't done

12 it yet, your Honor but he read through the indictment.

13 He's sitting right next to me, he (audio interference)

14 indictment with him.

15         MR. MARSHALL:  Yes, Judge, I did (audio

16 interference).

17         THE COURT:  Okay.  And do you have any concern

18 following your review of the indictment with your client

19 as to whether or not he understands the charges?

20         MR. MARSHALL:  No, Judge.  He understands the

21 charges.  I gave him an opportunity to ask questions as

22 well and he indicated he understands the charges.

23         THE COURT:  And is he prepared to enter a plea

24 today?

25         MR. VARGHESE:  Yes, of not guilty, your Honor.

5

                            Proceedings

1            THE COURT:  To all seven counts, I assume?

2            MR. VARGHESE:  Yes.  Yes, your Honor.  Thank

3   you.

4            THE COURT:  Okay.  Mr. Stewart, I want to

5   advise you that you have the right to remain silent.

6   Anything you say except what you say to your attorneys

7   can be used against you.

8            Do you understand that?

9            THE DEFENDANT:  Yes, your Honor.

10           THE COURT:  Now I also want to make sure you

11  understand that you have the right to be represented by

12  an attorney in connection with these charges.  My

13  understanding is that you have retained counsel in this

14  matter.  If for some reason, you cannot afford counsel,

15  the Court will appoint an attorney for you.

16           Do you understand that?

17           THE DEFENDANT:  Yes, your Honor.

18           THE COURT:  Okay.  Ms. McGrath, do we have a

19  date for Mr. Stewart to appear before the district judge

20  in this matter?

21           MS. MCGRATH:  Your Honor, I am conferring with

22  Judge Kuntz's deputy and am seeking something the week of

23  March 9th but nothing as of yet has been set.

24           THE COURT:  Okay.  Well, let me ask this

25  question.  What are we going to do with respect to the

6

Proceedings

1    question of bail?

2            MS. MCGRATH:  Your Honor, the government is

3    seeking detention and I understand defense counsel would

4    like to make a bail proposal.

5            THE COURT:  Okay.  But what's the basis for the

6    government to request detention in the first instance?

7            MS. MCGRATH:  Your Honor, the defendant is

8    charged with six counts of distributing child pornography

9    and one count of possessing child pornography between

10   January (audio interference) through November 2020.  The

11   evidence indicates he is a prolific collector of child

12   pornography.  He has a collection comprising thousands of

13   videos which he stores and shares in a variety of

14   platforms.  He's also an Australian National who is

15   formerly working for the Australian Trade Commission.

16           Under 18 USC 3142(e)(3)(E), there is a

17   rebuttable presumption of detention and in light of his

18   foreign ties and the extremely serious nature of the

19   charged offenses, the government feels there's no

20   combination or condition that could reasonably assure his

21   appearance or the safety of any other person or the

22   community.

23           And just looking at the four factors outlined

24   in the Bail Reform Act, each of them weighs in favor of

25   his detention.  The first being the nature and

7

Proceedings

1  circumstances of the crime, on numerous occasions over a

2  month long period, the defendant distributed child

3  pornography to undercover agents on  (audio interference)

4  platform.  These videos involved young children, many of

5  whom were toddlers being sexually abused by adults.

6           The defendant professed to having a favorite

7  video, (audio interference) in Count 4, is almost 16

8  minutes long, depicting a toddler who appears to be

9  drugged being anally penetrated by an adult.  This is the

10  tip of the iceberg in terms of the defendant's

11  collection.

12          He also possessed child pornography involving

13  prepubescent children on an electronic hard drive

14  recovered from his bedroom in a porn folder and the hard

15  drive contained photos of the defendant and his family as

16  well.  The heinous nature and pervasiveness of the crime

17  weighs in favor of remand.

18          The second factor being the history and

19  characteristics of the defendant also weigh in favor of

20  remand.  In conversations with an undercover agent, the

21  defendant made concessions that showed that his conduct

22  extends far beyond what has been charged and all of which

23  states he's a dangerous man.

24          He admitted that his preference was to see

25  "bubs (ph.) and toddlers getting fucked up" and that he

8

Proceedings

1   "loves rape and nasty stuff".

2           He admitted to having a collection of thousands

3   of videos and he admitted to sexually abusing his own

4   nephew in the past.

5           He also has very significant foreign ties which

6   creates a considerable flight risk.  He's an Australian

7   National with an Australian passport and he's in this

8   country on a sponsored working visa.  He has no relatives

9   in the area and it appears he has very few close friends.

10          He's also not actively working.  His role with

11  the Australian Trade has been suspended and it doesn't

12  seem he has a stable living condition either.  He had

13  formerly been living with a roommate who I believe is on

14  the line, Kong Peng (ph.), and they both moved out into

15  separate accommodations.  I understand that if the

16  defendant is released, he intends to live with his

17  roommate again in the roommate's new apartment but it's

18  unclear that this is a stable or consistent living

19  environment.

20          And the third condition, the danger imposed by

21  his release also speaks to the importance of remand here.

22  The danger is that the defendant will continue to engage

23  in the crimes for which he's been charged.  Here, even if

24  the Adam Walsh factors don't obviate that danger.  A

25  common condition is that the defendant's electronic

9

Proceedings

1  devices and internet usage be monitored.  However, if

2  he's living with Kong Peng, I understand that Kong Peng

3  is a computer programmer who has a number of different

4  electronic devices himself for purposes of his work.

5  There's no ability to monitor what Kong Peng is doing on

6  his devices or what the defendant is able to do on Kong

7  Peng's devices.

8           The same would be true if anyone else came to

9  that apartment with an electronic device that the

10 defendant has access to.  It's going to be particularly

11 difficult to monitor this defendant given his practices.

12 He uses foreign-based end-to-end encrypted platforms

13 like, Telegram, Flickr and Mega.NZ, each of which

14 professes to be beyond (audio interference) subpoena

15 power and which prevent anyone from -- the sender or

16 recipient of the method from seeing what's been sent.

17          Likewise, GPS monitoring which is a common

18 condition, in these cases while helpful, doesn't prevent

19 the defendant from cutting it and running it.  It just

20 goes pretrial a bit of an advanced notice, so that they

21 can begin the chase.

22          And being both an avid collector and

23 distributor of child pornography, he has been fueling an

24 industry that viciously and irreparably harms children

25 and the community at large and if released, there's a

Proceedings

1    significant concern that he'll continue to do so.

2            A fourth condition is the strength of the

3    evidence.  The distribution count stems from the

4    defendant's conversations with undercovers on social

5    media accounts.  The subscriber information for those

6    accounts including telephone numbers and email addresses

7    all go back to the defendant, as do the IP hit.  In fact,

8    IP hits show that the defendant accessed some of these

9    social media accounts from his workplace and the IP hits

10   go to his own log in at his place at work.

11           As mentioned, the external hard drive on which

12   the CP was found had photos of the defendant and his

13   family on vacation.  Accordingly, the evidence here is

14   very strong and that also creates a flight risk.

15           Finally, just speaking to flight risk, given

16   the seriousness of the charges and the sentencing

17   implications, that also creates the (indiscernible)

18   incentive for the defendant to flee.  He faces a five-

19   year mandatory minimum on the distribution charges and

20   the government calculates his guidelines sentencing range

21   to be between 135 to 168 months imprisonment.

22           And I should note that the government allowed

23   the defendant to self-surrender this morning.  We gave

24   defense counsel less than 24-hours notice to do so with

25   the understanding that HSI agents were poised and ready

11

Proceedings

1  to arrest and bring the defendant in should he fail to

2  arrive at the time designated.

3          At that time, the defendant was unaware of the

4  charges, the conduct to what they related and the

5  sentencing implications.  It's a very different thing to

6  think in the abstract that you may be arrested and you

7  may be in trouble for some of the conduct you engaged in

8  and to know today that you've been charged with seven

9  counts and that you face over ten years in prison.

10          Your Honor, for all those reasons, the

11  government respectfully requests a permanent order of

12  detention be ordered because the defendant is both a

13  serious flight risk and he poses a considerable danger to

14  the community.

15          THE COURT:  All right.

16          Counsel?

17          MR. VARGHESE:  Thank you, your Honor.  I am

18  going to just address many of the things about Mr.

19  Stewart.  This is a man who has been in the country now

20  for approximately eight years.  He was gainfully employed

21  by initially, the Australian Consulate and then the

22  Australian Trade Commission.

23          In November -- just let me take a further step

24  back, he has no prior criminal history.  In November, HSI

25  for the government executed a search warrant on his

12

Proceedings

1  apartment.  He could've fled then, your Honor.  Instead

2  of fleeing then, they didn't arrest him, he hired us,

3  basically the next day.  He came to our office and he

4  hired us and that point, we reached out to Ms. McGrath

5  and we informed her we're his counsel, please give us

6  notice.  This client isn't going anywhere.  He's going to

7  self-surrender if you give us the opportunity to do that.

8          Ms. McGrath already mentioned that he didn't --

9  she gave us less than 24-hours notice, try 12-hours

10  notice.  I got an email from Ms. McGrath at 7:28 p.m.

11  Now she did call the office in the morning but just after

12  a return call with no indication of anything, it was

13  yesterday, we had two hearings, at 7:28 p.m., I'm at home

14  with my kids and I see this email saying it's urgent that

15  we speak.  I, after a little phone tag, we get back on

16  the phone and at approximately 8 o'clock, she tells me

17  that they've indicted him and needs to surrender at 7:30

18  a.m. in this morning.

19          I asked her if he could surrender on Friday.  I

20  had a bunch of conflicts, including taking my own nine-

21  year-old to get a COVID test because his school has been

22  shut down, he needs it.  So I did that this morning.

23  That's why Mr. Marshall handled, rightfully he's quite

24  able and handled the pretrial interview.

25          I was able to get in touch with Mr. Stewart,

13

Proceedings

1  explained the situation to him and when Ms. McGrath

2  speaks about abstract, no, actually that's not even close

3  to accurate because the search warrant in this case

4  talked about manufacturing, the charge was manufacture of

5  child pornography which carries, with the guidelines, far

6  greater sentencing than what Ms. McGrath described.  So

7  we were to the extent somewhat relieved that he was

8  charged with distribution and possession.

9        This is -- and obviously with less than 12-

10  hours notice for a situation -- you know, it's not a

11  situation where we can come up with sureties.  We were

12  able to speak to Mr. Kong, who is on the line, who Mr.

13  Stewart is going to live with, has been living with.

14  They had to take separate entrances, Mr. Kong, downsized

15  -- excuse me, separate residences right across the street

16  from each other because Mr. Stewart upon the notification

17  of the -- upon the search warrant execution in November,

18  the government, and I spoke to Ms. McGrath about this,

19  why this was necessary, the government contacted the

20  Australian Trade Commission and informed him that he was

21  under investigation for possession of child pornography

22  and they promptly suspended him without pay.

23        So you know, the government created a situation

24  that we believe was unnecessary, extremely punitive

25  because he's under investigation.  I mean, I would like

14

Proceedings

1  to think there's a presumption of innocence.  I know the

2  Court understands it, we understand it but that's been

3  thrown out.

4          Instead of running, where he could've gone to

5  some country with a nonextradition treaty -- Australia

6  has an extradition treaty with the United States,

7  obviously one of the U.S.'s firm partners of the world,

8  he didn't choose to run.  He didn't try to get his

9  passport back.  They have his passport and he instead

10 hired us at great financial cost to himself.  He's not a

11 rich man, Judge and a detention in this case is just

12 punishing a person who doesn't have the resources -- he

13 spent his resources on hiring us and this is why we were

14 able to speak to him and get in touch with him and self-

15 surrender him.  He's committed to dealing with this case,

16 your Honor.

17         There is no reason why he can't be placed under

18 house arrest with ankle bracelet, with real-time computer

19 monitoring as he did in the case and phone monitoring.

20         You know, the government loves to cast

21 aspersions on people, especially on people they don't

22 know and presuming that Mr. Kong is going to be involved

23 in something that he's not. I mean, these are all

24 aspersions without basis and so -- without bases, excuses

25 me.

15

Proceedings

1    He's not charged with manufacture.  In terms of

2    risk to the community, as Ms. McGrath alluded to, it's a

3    rebuttable presumption.  He's not charged with

4    manufacturing.  The charges are serious.  We're not in

5    anyway underplaying that but I want to address some of

6    the things that were in the pretrial report, bottom of

7    page, she assessed him with nonappearance, limited --

8    number one, pretrial says limited familial property and

9    financial ties, all -- this is all true.  He doesn't have

10   people here in the United States that can put together a

11   bond package and obviously, the government requested

12   detention.  No bond package would be sufficient for them.

13   Yes, he has a substance abuse history.  He's

14   been clean for several months.  Despite that, he was

15   gainfully employed until November when the U.S.

16   government informed the Australian government that he was

17   under investigation for child pornography.

18   His substantial tie to a foreign country,

19   foreign government are Australia, one of the U.S.'s

20   possibly main partners with the world, a country that has

21   an extradition treaty with the United States and yes,

22   he's a noncitizen, he's here on a work visa.

23   Access to travel documents, that's not true.

24   They have their passport.

25   Unstable and suitable living conditions, Judge,

16

Proceedings

1  you know, he had to downsize because of his -- that he

2  was under investigation and in essence what this is is a

3  veiled way of saying you're not rich enough to have what

4  they would call suitable living condition.

5          And in terms of danger, the nature of the

6  instant offense, Judge, obviously I have had clients in

7  this district charged with the same things and being able

8  to be let out on bail.  Some of them, unfortunately --

9  unfortunately, Mr. Stewart doesn't have the money that he

10  (sic) has but they weren't confined to home detention.

11          So what we're suggesting to the Court which I

12  will ensure he's coming back and Mr. Stewart has

13  demonstrated that, Judge.  If he wanted to run, he

14  would've done so after November.  Instead, he hired us.

15  Ms. McGrath and I speak at 8 p.m. last night.  Mr.

16  Stewart is at Homeland Security at 7:30 a.m.  And if

17  there's anybody who is more committed, I can't think of

18  anybody with such short notice, more committed to

19  respecting this court, the Eastern District of New York,

20  in dealing with these charges than Mr. Stewart.  He

21  didn't have to deplete his savings to hire us and your

22  Honor, he's here.

23          And I think, Judge, with ankle bracelet, home

24  detention, you know, limiting himself to go to pretrial

25  and our office with prior -- you know, under the normal

17

Proceedings

1  conditions, monitoring, real time monitoring of his

2  computers and his phones and there's no -- this man

3  should be allowed to do that.

4        Let me take a step back, in addition, he's Type

5  2 Diabetic, Judge.  Obviously puts him at high risk of

6  COVID mortality, of death from COVID-19.  We know the

7  situations in the MDC and MCC, these have been dealt

8  with, written about.  The chief judges in both the

9  Southern and the Eastern Districts of New York have been

10 dealing with this issue, particularly limited access that

11 defense attorneys have in dealing with this (audio

12 interference) is we can't just go there the way we used

13 to be able to.  It's very difficult to get an

14 appointment.  I recently had a client who is supposed to

15 call, have a call arranged with us, and it didn't happen,

16 Judge.  It's been weeks.

17        THE COURT:  I understand that.

18        MR. VARGHESE:  This is the (indiscernible).

19        THE COURT:  I'm very familiar with the

20 conditions at MDC and MCC in my current role but that, in

21 my mind, is not the reason to disregard all of the other

22 factors that one is required to consider under the Bail

23 Reform Act.

24        And as the government's attorney has laid out,

25 these are very serious crimes.  There is based on my

18

Proceedings

1   review of the information that is before me, strong

2   evidence that the defendant has committed the offenses.

3   The government has a strong case.

4          I am very concerned about the fact that he does

5   not have -- he's got his position here on a visa, he's

6   not a citizen of the United States and a green card

7   holder.  He's an Australian National and the fact that we

8   have an extradition treaty with Australia is better than

9   having someone who has connections with a country with

10  which have no extradition treaty or that does not

11  eliminate the risk that he has great incentive to flee,

12  given the fact that according to the government, he is

13  facing a very significant period of time.

14         I appreciate the fact that his former roommate

15  has offered to come up with a bond, but I find it

16  insufficient to overcome the risk of flight that I see

17  and the danger to the community.

18         And I just want to make sure I heard Ms.

19  McGrath properly, did you say that he admitted to one of

20  the agents that he had sexually abused his nephew?  Did I

21  mishear you on that?

22         MS. MCGRATH:  Your Honor, no.  In an undercover

23  conversation, the defendant admitted -- sorry, the

24  defendant admitted in a conversation with an undercover

25  agent that in the past that he had sexually abused his

19

Proceedings

1  nephew.

2          THE COURT:  All right.  Well, so then I find

3  he's not only a risk of flight but a danger to the

4  community and I'm going to order him detained pending

5  trial.

6          The only other issue, I guess is what about

7  time?

8          MS. MCGRATH:  Your Honor, I heard from Judge

9  Kuntz's deputy that they could have the first status

10 conference on Friday, March 12th at 10:30 a.m.  The

11 government would ask that time be excluded until then so

12 that the government can produce discovery to defense

13 counsel.

14         THE COURT:  Mr. Varghese, do you have a

15 position on the order of excludable delay?

16         MR. VARGHESE:  We have no objection to the

17 exclusion of time, your Honor.

18         THE COURT:  All right.  So Mr. Stewart, under

19 the constitution and the laws of the United States,

20 you're entitled to a speedy and public trial by jury

21 commencing within 70 days of the filing of the indictment

22 that's the formal charges that I reviewed with you

23 earlier.

24         What the government has asked me to do is

25 exclude or not count the time from today until March 12th

20

Proceedings

1  when we're going to be appearing before the district

2  judge in this matter and the reason for excluding the

3  time is that during this period, the government will be

4  providing your attorney with information, discovery,

5  evidence that they have against you with respect to these

6  charges and potentially engaging in discussions with your

7  attorney to see if the case can be resolved through a

8  plea rather than through trial.

9          Has this been explained to you by your

10 attorney, Mr. Stewart?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  And do you consent to proceeding by

13 -- in other words, to me entering this order of

14 excludable delay at this time?

15         THE DEFENDANT:  Sorry, your Honor, I didn't

16 understand that.

17         THE COURT:  Do you agree to me entering an

18 order excluding the time from today until you see the

19 district judge in this case?

20         THE DEFENDANT:  I'm not sure what that means,

21 your Honor.  Could I ask Mr. Varghese's advice on that?

22         THE COURT:  Sure.  Mr. Varghese, maybe I am not

23 explaining it properly.

24         MR. VARGHESE:  Yeah.  I did not, in fairness to

25 Mr. Stewart, I did not discuss speedy trial exclusions

21

Proceedings

1    with him.  It's normally something I don't -- we don't do

2    in advance.

3            This is procedural, Darren and it's necessary

4    for us to receive the discovery and to challenge the

5    assertions made by Ms. McGrath today.

6            THE DEFENDANT:  All right.

7            THE COURT:  Okay.  So do you agree?

8            THE DEFENDANT:  Yes, your Honor.

9            THE COURT:  Okay.  Anything else today?

10           MS. MCGRATH:  Your Honor, I don't believe we've

11   done the Rule 5 app notice.

12           THE COURT:  Yes, thank you.  Thank you.  I feel

13   like I've done it with you already like three or four

14   times, so that's why I forgot.

15           So under the revised amended Rule 5 app, I

16   direct the prosecution to comply with its obligation

17   under Brady v. Maryland and its progeny to disclose to

18   the defense all information whether admissible or not,

19   that is favorable to the defendant, material either to

20   guilt or to punishment and known to the prosecution.

21           Possible consequences for noncompliance may

22   include dismissal of individual charges or the entire

23   case, exclusion of evidence and professional discipline

24   and court sanctions on the attorney's responsible.

25           I will be entering a written order more fully

22

Proceedings

1  describing this obligation and the possible consequences

2  of failing to meet it and I direct the prosecution to

3  review and comply with that order.

4         Ms. McGrath, does the prosecution confirm that

5  it understands it obligations and will fulfill them?

6         MS. MCGRATH:  Yes, your Honor and the

7  government understands will comply.

8         THE COURT:  All right.  Anything else?

9         MS. MCGRATH:  Nothing for the government.

10  Thank you, your Honor.

11         THE COURT:  Counsel, anything else for the

12  defendant?

13         MR. VARGHESE:  Not at present, your Honor.

14         THE COURT:  All right.  Thank you, everyone.

15  Have a nice evening.

16         THE CLERK:  Thank you, everyone.

17         MS. MCGRATH:  Thank you.

18                 (Matter Concluded)

19                      -o0o-

20

21

22

23

24

25

23

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **8th** day of **March** 2021.

*Linda Ferrara*
Linda Ferrara

AAERT CET 656
Transcriptions Plus II, Inc.