UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v.-<br><br>DARREN CHARLES STEWART<br><br>             Defendant. | 21 cr. 42 (WFK) |

**DARREN CHARLES STEWART'S SENTENCING MEMORANDUM**

                                                                                               Varghese & Associates, P.C.
                                         By:    Vinoo P. Varghese
                                                       2 Wall Street
                                                       New York, NY 10005
                                                       (212) 430-6469
                                                       info@vargheselaw.com

                                                       *Counsel for Mr. Darren Charles Stewart*

Dated:  March 15, 2023
           New York, NY

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES…..…………………………………………………....……..…iii

PRELIMINARY STATEMENT……………………………….………………………………1

I.  THE COURT SHOULD IMPOSE A BELOW-GUIDELINES SENTENCE OF FIVE YEARS BECAUSE SUCH A SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY TO COMPORT WITH THE PURPOSES OF §3553(a)(2) ………3

   A. § 3553(a)(1): The Court Should Impose A Sentence Of 60 months Based On The Nature And Circumstances Of Mr. Stewart's Offense And His History And Characteristics……………………………………………………………………………3

   B. Under § 3553(A)(2) A Five-Year Sentence Sufficiently 1) Reflects The Seriousness Of The Offense, Promotes Respect For The Law, And Provides Just Punishment For The Offense; 2) Affords Adequate Deterrence To Others Similarly Situated; 3) Protects The Public From Further Crimes By Mr. Stewart; And 4) Provides Mr. Stewart With Needed Correctional Treatment While Incarcerated ………………………………………………..…………………………………………..4

   1. Mr. Stewart is generous, trustworthy, and filled with potential to serve others……………………………………………………………………………….4

   2. Mr. Stewart has been consistently employed and is an experienced paramedic…………………………………………………………………………….4

   3. Even while incarcerated, Mr. Stewart has proven he is a selfless individual …………………………………………………………………………….4

   4. Mr. Stewart was a child victim of physical and sexual abuse, which impacted his adult life and descent into drugs leading to the instant offense……………………………………………………………………………..5

   5. Notwithstanding his childhood, Mr. Stewart isn't a pedophile, had no prior criminal history, is low risk of recidivism and is not a threat to anyone…..5

II. MR. STEWART'S TWO YEARS OF PANDEMIC INCARCERATION AT MDC IS A MITIGATING CIRCUMSTANCE NOT TAKEN INTO CONSIDERATION BY THE SENTENCING COMMISSION IN FORMULATING THE GUIDELINES AND THUS THE COURT SHOULD GIVE HIM A BELOW GUIDELINES SENTENCE OF FIVE YEARS UNDER § 3553(b)(1)……………………………………………………………6

   A. The Conditions At MDC Are Known To Be Cruel, As The Court Has Acknowledged………………………………………………………………………...……6

   B. MDC does not provide proper medical care to inmates, which caused Mr. Stewart to become seriously ill and hospitalized, and but for the intervention of MS-13 gang members, Mr. Stewart may have died……………………………………………………8

    C.  Harsh pre-trial confinement can serve as a permissible basis for imposing a below-guidelines sentence—in Mr. Stewart's case it should……………………………………9

CONCLUSION……………………………………………………………………..…………10
EXHIBIT LIST…………………………………………………………………………..11

# TABLE OF AUTHORITIES

**CASES**

*United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004, Marrero, J.)…………….……...2
*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010)……………………………………………2
*United States v. Tutty*, 612 F.3d 128 (2d Cir. 2010)………...…………………………….......2
*United States v. McCaulley*, 2022 U.S. Dist. LEXIS 42939; 2022 WL 715551
(E.D.N.Y. 2022, Kuntz, J.)……………………………………...…………………………...……....2
*United States v. Carty*, 264 F.3d 191 (2d Cir. 2001)………………………………………...9
*United States v. Roser*, 529 Fed.Appx. 450 (6th Cir. 2013)……...……………………………9
*Jimenez v. United States*, 2006 WL 3742787 (D.P.R. 2006)……………………..…………9
*United States v. Naranjo-Ramirez*, 402 Fed.Appx. 576 (2d Cir. 2010)…………………….…..9

**STATUTES**

U.S.S.G. § 2G2.2………………………………………………………………………………2
18 U.S.C §3553 (a)……………………………………………………………………….………3,4,10
18 U.S.C §3553 (b)…………………………………………………………………………….6,9,10

# PRELIMINARY STATEMENT

For the reasons set forth below, Mr. Stewart respectfully requests that the Court sentence him to five years' prison. Mr. Stewart, an Australian national, instead of fleeing the country, voluntarily surrendered, and has spent over two years at the Metropolitan Detention Center (MDC) in Brooklyn, New York during the worst period to be incarcerated there—the COVID-19 (Covid) Pandemic ("Pandemic"). As the Court commented previously, incarceration at MDC often meant facing inhumane conditions.[1] The cruelty that Mr. Stewart endured included but were not limited to nearly non-existent medical care, unsanitary environs, continuous solitary confinement, lightbulb shortages, infrequent Covid testing, and the absence of facility use, such as the gym and prayer space. As Mr. Stewart is Australian national, on top of these conditions he has been unable to see his family and friends while locked up at MDC. With a 15-hour time difference, the only access Mr. Stewart has to his family members are emails or occasional short calls. Mr. Stewart has had no visitors other than legal. While prison experiences are difficult on all inmates, nevertheless, Darren Stewart's physical ailments were left untreated by MDC staff leading to an emergency hospitalization. Below, Mr. Stewart, through counsel, respectfully submits this memorandum detailing the impact of MDC's onerous conditions on him and requests the Court recognize that the Guidelines in this case are not only unreasonable, but also do not take into consideration the deleterious impact the conditions have had on him.

**Background**

On November 10, 2020, Homeland Security officials executed a search warrant on his Queens apartment and seized his electronic devices. Mr. Stewart, an Australian national, instead of fleeing the country, retained counsel. On January 27, 2021, counsel learned from the government about Mr. Stewart's arrest warrant in the instant case and informed him promptly. Instead of fleeing the country, Mr. Stewart voluntarily surrendered the next morning.[2] He has been detained since then. After completing his prison sentence, Mr. Stewart will be deported. If given the mandatory minimum sentence, Mr. Stewart, who isn't a pedophile, and is low-risk for recidivism, can be deported quicker and go back to his homeland to receive the support of his loving family and begin a new, more productive chapter of his life, perhaps as a paramedic, which he was before in Australia.

Despite years of childhood emotional, physical, and sexual abuse, including anal rape by his mother's brother, Mr. Stewart was a law-abiding citizen until succumbing to controlled substances. His drug abuse led to his only arrest for the crimes he pleaded guilty to before the Court. In addition to the toll narcotics took on his body, Mr. Stewart is diabetic and developed high blood pressure and high cholesterol while at MDC. Since the execution of the search warrant in November 2020, Mr. Stewart has been plagued by extreme insomnia and anxiety. MDC has not given Mr. Stewart an opportunity to speak with mental health counselors other than a brief conversation in January 2021. Nonetheless, he has come to grasp the dangers of his drug abuse

---

[1] *NYC judge bashes Brooklyn jail for failing to fix inmate's broken toilet: 'This is a disgrace'*. Available at https://www.nydailynews.com/new-york/ny-brooklyn-federal-jail-mdc-judge-william-kuntz-toilet-broken-20210727-dc676zcjvvefplbs3msszmfi6i-story.html. NEW YORK DAILY NEWS, July 27, 2021. Last visited, March 14, 2023.
[2] Counsel was present for his arraignment before the magistrate that day.

1

and will benefit from substance abuse treatment.

In addition to poor attention to mental and physical well-being, MDC Brooklyn has been the subject of controversy regarding "appalling conditions" for several years.[4]  Prior to the pandemic, some criticisms of MDC included not being allowed to see visitors and attorneys, heating problems, and extended periods of stay in cells for prisoners.[5]  Following Covid's rise, these conditions worsened as inmates were locked in their cells around the clock and not provided with effective PPE.[6]  Since 2020, MDC has had a lack of transparency regarding the reform steps they would take to fix the current situation.  In the past two years, four detainees have committed suicide, while others have died under unexplained circumstances.[7]

Mr. Stewart's incarceration in MDC has inflicted upon him "a magnitude of punishment effectively disproportionate to that meted out to offenders in the ordinary case."  *United States v. Mateo*, 299 F. Supp.2d 201, 208 (S.D.N.Y. 2004, Marrero, J.).  As such, the terrible conditions at MDC Mr. Stewart suffered through "exceed what is necessary to serve the prescribed purposes of sentencing."  Id.  These two years cannot be adequately measured in time alone.  These conditions "effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines."  Id.

The advisory guideline range in this case is far greater than necessary to satisfy the goals of sentencing.  The harsh sentencing recommendations of U.S.S.G. § 2G2.2 are not based on past practice or empirical data and has been under scrutiny by the Second Circuit for over a decade.  *See United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010); and *United States v. Tutty*, 612 F.3d 128 (2d Cir. 2010).  Mr. Stewart's advisory guidelines range today with acceptance is 308% longer than the sentence he would have faced under the mandatory guidelines adopted in 1991 when child pornography became a federal crime.  Back in 1991, he would have faced with acceptance an adjusted offense level of 21 totaling 37-46 months.[8]  After a review of this memorandum, the defense respectfully requests that the Court sentence Mr. Stewart to a below-guidelines sentence of 60 months, the mandatory minimum.[9]

In this matter, the United States Probation Office has calculated a guideline range of 151 to 188 months.  This range is based on an adjusted offense level of 34 and Criminal History Category I.  This advisory range should not be heeded because it (1) is the product of child pornography guidelines not based on empirical data and one which the Second Circuit has

---

[4] https://www.brooklynpaper.com/congressional-candidates-call-for-greater-oversight-at-troubled-mdc/

[5] Id.

[6] Id.

[7] Id.

[8] *See* 1991 United States Sentencing Guidelines available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1991/manual-pdf/1991_Guidelines_Manual_Full.pdf.  Last visited March 14, 2023.

[9] The defense knows the Court is aware of the non-binding nature of the Guidelines in the post-*Booker* world and will not waste paper or typeface on this.  *See e.g. United States v. McCaulley*, 2022 U.S. Dist. LEXIS 42939; 2022 WL 715551 (E.D.N.Y. 2022, Kuntz, J.).  Furthermore, as Probation has noted on PSR page 17, ¶105 "in *United States v. Dorvee* (citation omitted), the Second Circuit found USSG §2G2.2 to be 'fundamentally different,' and that 'unless applied with great care, can lead to unreasonable sentences' that are inconsistent with the mandates of 18 U.S.C. §3553.

described as "eccentric;" (2) fails to take proper account of Mr. Stewart's age, first offender status, strong support network, drug addiction, unduly harsh detention environment, strong feeling of remorse, and low risk of recidivism; and (3) is far greater than necessary to promote the goals of sentencing in this case.

**I.  THE COURT SHOULD IMPOSE A BELOW-GUIDELINES SENTENCE OF FIVE YEARS BECAUSE SUCH A SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY TO COMPORT WITH THE PURPOSES OF §3553(a)(2)**

Mr. Stewart should receive a sentence of 60 months because such a sentence is sufficient, but not greater than necessary, under the circumstances. First, the Court should impose a sentence of 60 months based on the nature and circumstances of Mr. Stewart's offense and his history and characteristics. Next, under §3553(a)(2)(A), a sentence of five years sufficiently reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. Then under §3553(a)(2)(B), such a sentence is sufficient to afford adequate deterrence to others similarly situated. Furthermore, under § 3553(a)(2)(C), such a sentence sufficiently protects the public from further crimes by Mr. Stewart. And, under §3553(a)(2)(D), such a sentence will sufficiently provide Mr. Stewart with needed correctional treatment while incarcerated.

**A.  § 3553(a)(1): The Court Should Impose A Sentence Of 60 months Based On The Nature And Circumstances Of Mr. Stewart's Offense And His History And Characteristics**

The Court should impose a sentence of 60 months based on the nature and circumstances of Mr. Stewart's offense and his history and characteristics. For his distribution crimes, which involved six videos sent on two different dates to an undercover officer for which he received no compensation, five years is more than sufficient to satisfy §3553(a)(2) factors.

For Mr. Stewart's profitless, drug-fueled crimes, where he had no contact with any minors, instead of fleeing the country, he chose to stay here, retain counsel, and voluntarily surrendered himself only to almost die at the MDC. He is remorseful for the crimes he committed and in a timely fashion, pleaded guilty to the charges, thereby saving the government from expending resources for a trial. Mr. Stewart has reflected deeply upon the mistakes he made and knows how much suffering he has caused himself and his family.

Before his arrest for the underlying offense, Mr. Stewart had no criminal history. He is a generous friend and family member. While his marriage became strained due to his hidden homosexuality, even after his divorce, he is still close to his ex-wife. Mr. Stewart has a substantial network of family and friends who want him to have a second chance to help others, which he did as a paramedic.

He isn't a pedophile and is low risk of recidivism. Mr. Stewart will be deported to Australia upon completion of his sentence, and with the lowest possible sentence of five-years, he will have a chance to start anew in his home country, while still a relatively young man.

3

> **B. Under § 3553(a)(2) a five-year sentence sufficiently 1) reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; 2) affords adequate deterrence to others similarly situated; 3) protects the public from further crimes by Mr. Stewart; and 4) provides Mr. Stewart with needed correctional treatment while incarcerated**

> **1. Mr. Stewart is generous, trustworthy, and filled with potential to serve others**

Mr. Stewart has had a very positive impact in the lives of those around him, and he is still afforded their unconditional support. Mr. Stewart's love for his family and his gentle nature is a key aspect of his personality, with even his former in-laws commending him for his kindness. *See* Gierke Letter (Exhibit 1). Mr. Stewart's friend, Michael Olson, has described him as generous, and has detailed the ways in which Mr. Stewart will go out of his way to help others. *See* Olson Letter (Exhibit 2). Both of Mr. Stewart's former lovers—his ex-wife, Ms. Annette Stewart, and his ex-partner, Mr. Kang Peng—are still involved in his life, with the former describing him as a devoted father and the latter describing him as kind and supportive to all. *See* Annette Stewart Letter (Exhibit 3); and Peng Letter (Exhibit 4).

No one has spoken more positively about Mr. Stewart, however, than his children Kyle and Melleesa Stewart. To his children, he is a role model and a hero. Melleesa wrote a letter in which she revealed that her and her brother's friends still refer to Mr. Stewart as "Dad," and loved to be around him. She also described his heroic deeds as a paramedic, explaining how her father once swam through flood waters to save a child, and on another occasion, hung upside down in a grain silo to administer medication to a man who had been crushed. Melleesa writes that her father has "saved the lives of countless souls." Melleesa Letter (Exhibit 5). In Kyle's letter, he describes how, even years after Mr. Stewart immigrated to the United States, people in their community consistently ask about him and how he is doing. "They always, without fail, ask [Kyle] to pass on their best wishes to him." Kyle Stewart Letter (Exhibit 6).

Mr. Stewart's support network is robust, and they desperately await his return to them. Unlike many other similarly situated defendants, Mr. Stewart's tremendous support network of his ex-wife, his ex-partner, friends, and his children, reduces the likelihood of recidivism.

> **2. Mr. Stewart has been consistently employed and is an experienced paramedic**

From 1986 until January 28, 2021, the day he voluntarily surrendered to authorities, Mr. Stewart consistently held jobs and had been a productive member of Australian society. *See* PSR page 13. Mr. Stewart began working as a paramedic there when he was 16 years old and continued this work until he left for the United States. *Id.* After his arrival in New York, Mr. Stewart worked as a finance officer for the Consulate General of Australia and then as an office manager for the Australian Trade and Investment Commission ("Austrade"). *Id.* He worked for Austrade until his voluntary surrender.

> **3. Even while incarcerated, Mr. Stewart has proven he is a selfless individual**

Despite his current incarceration, Mr. Stewart has continued to prove that he is a selfless

4

and caring individual, volunteering his time as a "suicide companion." Mr. Stewart's Statement (Exhibit 7). In addition to his full-time work in the facility's kitchen, Mr. Stewart took a special course to become qualified to sit outside of the cells of inmates on suicide watch and keep them company to prevent them from harming themselves. These shifts typically last six hours at a time, and to qualify for the training program, an inmate needs the Corrections Officer's recommendation. *Id.* As of the drafting of this memorandum, Mr. Stewart has completed over one hundred hours of service. In addition, he has completed a therapy program called "Quiet Moments." See Quiet Moments Certificate (Exhibit 8).

4. **Mr. Stewart was a child victim of physical and sexual abuse, which impacted his adult life and descent into drugs leading to the instant offense**

Mr. Stewart was subject to years of physical and sexual abuse. *See* PSR, page 9. Mr. Stewart's mother would egg on his alcoholic father to beat him with a strap. *Id.*

Between the ages of 10 and 15, Mr. Stewart's uncle, his mother's brother, repeatedly anally raped him. *Id.* When Mr. Stewart reached adulthood, Australian police charged his uncle for sexually abusing his own children—Mr. Stewart's cousins. *Id.* Mr. Stewart was too afraid to testify, and his uncle was acquitted after trial, leading to the suicide of one of his cousins. *Id.* To this day, Mr. Stewart regrets not testifying against his uncle. *Id.* This difficult upbringing adversely impacted Mr. Stewart and led to his drug abuse and the instant crime.

5. **Notwithstanding his childhood, Mr. Stewart isn't a pedophile, had no prior criminal history, is low risk of recidivism and is not a threat to anyone**

Dr. Richard Krueger, a professor at Columbia Medical School and a board certified forensic and addiction psychiatrist, evaluated Mr. Stewart, and concluded that Mr. Stewart isn't a pedophile. *See* page 13, Dr. Krueger Report (Exhibit 9).

At the end of his report, Dr. Krueger writes the following:

> Mr. Stewart was involved for about a 9-month period of time with a group of men who described themselves as pedophiles and with whom he viewed child pornography. His involvement with child pornography was very much related to his substance abuse and he would be an excellent candidate for the residential drug and alcohol program in federal prisons (RDAP). He is not a pedophile, and his risk of re-offense is low according to 6 instruments used to assess such risk.

*Id.*

Considering Dr. Krueger's evaluation, the defense requests that the Court give Mr. Stewart the ability to continue his rehabilitation, which began with his incarceration. As his risk of re-offense is low, we ask the Court to sentence Mr. Stewart to five years' prison. With his mandatory deportation to Australia, a minimum sentence will allow him to return to his family quicker where

he can complete his journey toward rehabilitation and redemption. His family has been deeply supportive and will aid Mr. Stewart's re-entry into society.

II. **MR. STEWART'S TWO YEARS OF PANDEMIC INCARCERATION AT MDC IS A MITIGATING CIRCUMSTANCE NOT TAKEN INTO CONSIDERATION BY THE SENTENCING COMMISSION IN FORMULATING THE GUIDELINES AND THUS THE COURT SHOULD GIVE HIM A BELOW GUIDELINES SENTENCE OF FIVE YEARS UNDER § 3553(b)(1)**

The conditions at MDC are known to be cruel, as the Court has acknowledged. Furthermore, MDC does not provide proper medical care to inmates, which caused Mr. Stewart to become seriously ill and hospitalized, and but for the intervention of MS-13 gang members, Mr. Stewart may have died. Finally, harsh pre-trial confinement can serve as a permissible basis for imposing a below-guidelines sentence, and it should in Mr. Stewart's case.

### A. The Conditions At MDC Are Known To Be Cruel, As The Court Has Acknowledged

Mr. Stewart has been unduly punished throughout his detention at MDC, a jail that has received quite a bit of media attention for its inhumane conditions. Additionally, MDC has taken on an influx of prisoners following the closure of MCC, despite the fact that the facility already had difficulty providing basic services such as adequate discovery computers and law library access.[30] When describing MDC, civil rights attorneys have described it as "nearly as bad, if not just as bad, as MCC," a prison closed by the BOP due to its deteriorating conditions.[31]

The Court, itself, has acknowledged the dismal conditions present at MDC. A July 2021 complaint brought before the Court revealed that an inmate's toilet had been broken and remained unfixed for days. When these complaints were brought to staff, the defendant was mocked and corrections officers did little to remedy the situation and didn't let him use another toilet. Regarding the incident, the Court said the following:

> It's ridiculous that it takes distinguished defense counsel, distinguished prosecutors and an OK district court judge to get a toilet fixed…I don't care if the defendant is Jack the Ripper… [w]e treat people under our care with respect and decency because it reflects on the entirety of the criminal justice system.[32]

---

[30] *Manhattan jail closure renews concerns over Brooklyn facility conditions* https://www.courthousenews.com/manhattan-jail-closure-renews-concerns-over-brooklyn-facility-conditions/. COURTHOUSE NEWS SERVICE, August 27, 2021. Last visited, March 14, 2023.

[31] *Staff, inmates support closing filthy NYC jail where Jeffrey Epstein killed himself* https://www.nydailynews.com/new-york/ny-mcc-jail-manhattan-closing-bop-federal-renovations-20210827-fnrx4bqozvgkfdc7jlxczxsuka-story.html. NEW YORK DAILY NEWS, August 27, 2021. Last visited, March 14, 2023.

[32] *NYC judge bashes Brooklyn jail for failing to fix inmate's broken toilet: 'This is a disgrace'*. Available at https://www.nydailynews.com/new-york/ny-brooklyn-federal-jail-mdc-judge-william-kuntz-toilet-broken-20210727-dc676zcjvvefplbs3msszmfi6i-story.html. NEW YORK DAILY NEWS, July 27, 2021. Last visited, March 14, 2023.

It is clear that the conditions at MDC are typically deplorable, and these were only exacerbated by the Pandemic, throughout which Mr. Stewart was incarcerated at the facility. MDC failed to properly address the Pandemic, leaving Mr. Stewart and other inmates very vulnerable.

With MDC having poor conditions even during a relatively "normal" period in the world, it is not difficult to believe that conditions became increasingly inhumane as the COVID-19 Pandemic descended upon the country. As of January 7, 2022, MDC Brooklyn had the highest number of COVID-19 positive detainees in the nation, with over 15% of the facilities population testing positive for COVID.[33] The National Association of Criminal Defense Lawyers took note of this:

> [T]he Bureau of Prisons must protect people in its care from inhumane and dangerous conditions which ensure the spread of COVID inside detention facilities and beyond the walls of these facilities given necessary contact with staff and visitors including their constitutionally-required legal counsel. NACDL calls on the Biden Administration to appoint a BOP Director who will protect people entrusted to the care of the Bureau of Prisons by immediately establishing necessary health and safety protocols and standards.[34]

Even more damning, during the early stages of the pandemic members of US Congress, New York State Senate, and New York City council members visited the MDC. Following their visit, they released a joint statement denouncing the facilities on May 15, 2020. They wrote the following:

> MDC Brooklyn has a long, troubled history, but it is increasingly clear that the COVID-19 pandemic has compounded problems at this institution. Most recently, we were alarmed by the findings of Dr. Venters, who visited the site in late April. His analysis suggested that, far from being prepared for COVID-19, management's practices at the facility are endangering staff and inmates alike, and heightening risk of transmission in our federal prison system. We also find disconcerting the BOP's assertion that while confirmed COVID-19 cases among staff at MDC Brooklyn continue to rise, there are no new infections among inmates. This inconsistency raises credibility issues about what is being done to identify infected inmates and to protect staff and inmates from further spread of the virus at this facility… inmates are being distributed inadequate, flimsy facial masks that quickly deteriorate; sick staff continue reporting to work specifically because of BOP administrative policies; and inmates at MDC are not being tested in a manner

---

[33] *NACDL Condemns Inhumane Conditions at the Metropolitan Detention Center in Brooklyn* https://www.nacdl.org/newsrelease/010722_InhumaneConditionsMDC. NACDL.ORG last visted, March 14, 2023.
[34] Id.

7

> sufficient to slow – let alone stop - the spread of coronavirus.[35]

Mr. Stewart, whose incarceration began in January 2021, has unduly suffered during the Pandemic, with little precautions and protocols taken by prison staff to ensure his physical well-being. Mr. Stewart is over the age of 50, obese, diabetic, has high blood pressure, and high cholesterol. *See* PSR, page 11.

### B. MDC does not provide proper medical care to inmates, which caused Mr. Stewart to become seriously ill and hospitalized, and but for the intervention of MS-13 gang members, Mr. Stewart may have died

The inhumane treatment faced by Mr. Stewart at MDC can be best exemplified by the facility's grossly inadequate response to his urinary tract infection. *See* PSR Addendum which confirmed Mr. Stewart's urinary tract infection and dysuria and subsequent hospitalization.

Mr. Stewart wrote about the terrible conditions:

> For the vast majority of the time during which I was incarcerated here, COVID-19 was raging and visiting rights were heavily restricted. Beyond this though were the conditions in MDC that staff members continue to ignore. As you probably know, due to the pandemic we were regularly locked in our cells from 7am-9pm without relief. While this is frustrating, what is even more upsetting is the conditions in which these lock ins occurred. My lights in my cell regularly go out and I was forced to sit in darkness for days at a time before the lightbulbs were switched. I was unable to use the gym, or the church. While I could take showers, the conditions were so filthy that I had genuine fear for my wellbeing while showering.

*Id*.

In a meeting with counsel, Mr. Stewart explained what felt like a near death experience to him:

> On the third day, I could not urinate and felt my bladder was really full. I could not get down the steps because I felt so much pain. Two MS-13 gang members took me down the steps and dragged me to a CO and said I needed help. The CO called the doctor, and the doctor came about an hour later asking for my sick pool paperwork. When I told him I did not have any yet, he refused to see me and left. He told me I needed to go upstairs but I could not walk. The two MS-13 members put more pressure on the CO, before they called a nurse. She said my bladder was taut and I needed medical attention. They

---

[35] *NYC Elected Officials Statement Regarding Metropolitan Detention Center Brooklyn* https://velazquez.house.gov/media-center/press-releases/nyc-elected-officials-statement-regarding-metropolitan-detention-center. CONGRESSWOMAN NYDIA VELÁZQUEZ, May 15, 2020. Last visited, March 14, 2023.

8

> took me to an emergency room in a stretcher, but they were not able to put a catheter in. A nurse practitioner tried to insert the catheter next, and he said there was internal bleeding. I was then transferred to the Kingsbrook Jewish Medical Center, where I stayed for about five days before being transferred back to MDC.

*Id.*

The response from the medical staff at MDC was at best inadequate. Mr. Stewart was put into an unnecessarily dangerous medical situation because staff did not take his reports seriously. On top of the poor response by the facility, it is known to MDC that Mr. Stewart has pre-existing conditions—namely diabetes, high blood pressure, and high cholesterol. These all increase his risk for serious illnesses, and yet, Mr. Stewart was left unheeded. PSR, page 11.

### C. Harsh pre-trial confinement can serve as a permissible basis for imposing a below-guidelines sentence—in Mr. Stewart's case it should

Under §3553(b), in imposing a sentence, a court may consider "the presence of mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." In *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001), the Second Circuit held that presentence confinement conditions may in appropriate cases be a permissible basis for downward departures.

While *Carty* was decided pre-*Booker*, courts have continued to consider pre-sentence confinement conditions as a permissible basis for imposing a below-Guidelines sentence. *See United States v. Roser*, 529 Fed.Appx. 450, 453 (6th Cir. 2013) (acknowledging that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures" and citing *Carty*); *Jimenez v. United States*, 2006 WL 3742787 (D.P.R. 2006)(noting that "In *Carty*,…the Second Circuit held that presentence confinement conditions may, in appropriate cases, be a permissible basis for downward departures."); *see also United States v. Naranjo-Ramirez*, 402 Fed.Appx. 576 (2d Cir. 2010) (citing *Carty*'s holding that "[P]re-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures."). As described in detail above, Mr. Stewart's lack of treatment and MDC's inhumane conditions, which may have led to his death, should serve as bases for mitigation under §3553(b).

9

## CONCLUSION

For the foregoing reasons, Mr. Stewart respectfully submits that a five-year sentence is sufficient, but not greater than necessary to achieve the goals of 18 U.S.C. §3553(a) and is warranted under §3553(b).

Dated:    March 15, 2023
         New York, NY

                                        Respectfully submitted,

                                        Varghese & Associates, P.C.
                                        _____/s/_____

                              By:    Vinoo P. Varghese

                                     *Counsel for Mr. Darren Charles Stewart*

10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

DARREN CHARLES STEWART

Defendant.

21 cr. 42 (WFK)

**Exhibit List**

1. Letter from Hazel Gierke

2. Letter from Michael Olson

3. Letter from Annette Stewart

4. Letter from Kang Peng

5. Letter from Melleesa Stewart

6. Letter from Kyle Stewart

7. Darren Charles Stewart Statement

8. "Quiet Moments" Certificate

9. Dr. Richard Krueger Psychiatric and Risk Assesment of Mr. Darren Charles Stewart

11